UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED
00 JAN 14 PH 5: 11
N.D. OF ALABAMA

CAMBER INTERNATIONAL, LLC          )
                                   )
        Plaintiff,                 )
                                   )
vs.                                )     Civil Action No. 00-S-0012-NE
                                   )
MACMET INDIA LIMITED,              )
                                   )     **ENTERED**
        Defendant.                 )
                                         JAN 14 2000

## MEMORANDUM OPINION

This action is before the court on plaintiff's motions for imposition of contempt sanctions and preliminary injunctive relief, and, defendant's motion to dismiss, or, in the alternative, to compel arbitration. For the reasons discussed below, the motion to adjudge defendant in contempt is denied, the motion for injunctive relief is denied as moot, and the motion to dismiss, construed as a motion to stay judicial action pending proceedings in an arbitral forum, is granted.

### I. BACKGROUND

Plaintiff, Camber International, L.L.C., is a Georgia corporation with its principal place of business in Atlanta, Georgia ("Camber"). Camber is a wholly owned subsidiary of Camber Corporation, a Delaware corporation with its principal place of business in Huntsville, Alabama ("Camber Alabama"). Camber designs and develops "training systems, constructive simulations, tactical

simulators and system integration." (Plaintiff's complaint ¶ 15.)
It also "develop[s] software, [and] provide[s] technical
consultancy services, equipment, systems and sub-systems." (Id.)

Defendant Macmet India Limited ("Macmet"), is "a company
registered under the Companies Act of 1956," with its principal
place of business in Calcutta, India. (Id. ¶ 2.) "Macmet is an
engineering software company with expertise in developing real time
defense simulations and real time software applications."
(Madappa's affidavit ¶ 20.)

Macmet entered into a contract with the "Indian Government [on
June 11, 1998,] to develop, supply and support the Action Speed
Tactical Trainer (ASTT) at Mumbai." (Plaintiff's motion for
preliminary injunction, exhibit 2 at preamble.) Macmet describes
the ASTT as

> a computer system upon which military officers simulate
> military operations and technical maneuvers through a
> series of "war games" simulated on a computer system.
> More specifically, the ASTT provides technical training
> to enhance the decision-making and teamwork skills of
> Indian naval officers.

(Defendant's motion to dismiss ¶ 1.)

In the process of procuring the contract with the Indian Navy,
representatives of Macmet, together with representatives of Camber,
met with Indian Naval officials on July 23 and 24 of 1996, to begin

2

developing a proposal for the ASTT.  (Madappa's affidavit ¶ 29.)
Camber submitted a proposal to Macmet on August 2, 1996 for a
portion of the work, and on October 4, 1996, Camber assisted
Macmet in presenting a proposal to the Indian Navy at a meeting in
New Delhi, India.  (*Id.* ¶¶ 30-31.)  "Camber was integral to
Macmet's proposal to the Indian Navy, and was actively involved in
all aspects of the discussion and all decisions concerning the
anticipated contract."  (*Id.* ¶ 32.)

Subsequently, on August 28, 1998, Macmet and Camber entered
into a contract, whereby Camber, "the seller," agreed to assist
Macmet, "the buyer," in fulfilling its obligations under the ASTT
contract.  (Plaintiff's motion for preliminary injunction, exhibit
2 at preamble.)  Specifically, the scope of Camber's contractual
responsibilities consisted of:

> The SELLER undertakes to supply Hardware, Software and
> Documents, hereinafter referred to as Deliverable Items,
> and provide services, hereinafter referred to as
> Deliverable Services, the details of which are placed at
> Annexures 1 and 2.  The SELLER shall be the Technical
> Lead for the ASTT Project through the PAT [the formal
> Preliminary Acceptance Tests] and provide Technical
> Support to the BUYER for the remainder of the Project as
> defined in the WBS and associated schedules contained in
> Annexure 2.

(*Id.* at Article 2.)

3



In exchange for Camber's performance, Macmet agreed to pay Camber the total sum of $3,481,515 in United States currency. (*Id.* at Article 3.1). The parties agreed, however, that Camber would receive certain scheduled payments upon reaching specified contractual milestones, with the first payment, designated as an "advance payment," to consist of:

> Fifteen Percent (15%) of the Contract Price [equaling] $522,227... [to] be made on signing of this Contract by bank transfer to the SELLER's bank and submission by the SELLER of:
> a) Three (3) copies of commercial invoice, and,
> B) Advance payment guarantee as per Article 3.5.

(*Id.* at Article 3.4.1.)

Pursuant to Article 3.4.1 of the contract, Macmet's advance payment was due only after Camber provided a bank guarantee, in the form of an irrevocable letter of credit, in an amount equal to that payment, as provided in Article 3.5, reading as follows:

> The SELLER shall provide a Bank Guarantee for advance payment for US $522,227.... The guarantee shall be in the form set out in Annexure 4(a), and shall be issued by a Scheduled bank recognized by the Reserve Bank of India. This guarantee shall come into force upon receipt of the advance payment by the SELLER and shall be valid till the completion of the Preliminary Acceptance Tests. This bank guarantee shall be reduced to ... $92,158 ... on issuance of PAT certificate, and remain in effect until the Final Acceptance Tests are successfully completed and the Final Acceptance Certificate is issued by the USER.

(*Id.* at Article 3.5.)

4

The contract also contains a number of clauses pertaining to the resolution of disputes between the parties. For instance, the contract contains a choice of law provision, providing that disputes shall be governed by the laws of India. (*Id.* at Article 23.1). Moreover, the contract provides that any disputes arising out of this contract shall be submitted to arbitration. (*Id.* at Article 14.) The arbitration clause specifies that all arbitral proceedings shall be conducted in accordance with the International Chamber of Commerce Rules for Arbitration.

> b) Notwithstanding anything elsewhere provided in this contract, dispute, disagreement or any question arising of or relating to this contract, or relating to its construction or performance which can not be settled amicably within 60 days or longer period as may be mutually agreed upon from the date of which either party informs the other in writing by a notice that such a dispute, disagreement of question exists be referred to an arbitration tribunal consisting of three arbitrators, which shall convene and proceed in accordance with International Chamber of Commerce Rules for Arbitration.

(*Id.* (emphasis supplied).)

Additionally, the contract contains a Force Majeure clause, delineating a category of events that conceivable could either delay a party's performance under the contract or, in some instances, excuse a party's nonperformance:

> Storm, fires, floods, natural disaster or other act of God, epidemic, acts of war, civil commotion, strike,

5

sabotage, explosion, <u>acts of Governments</u>, quarantine restrictions or any other such occurrences beyond the reasonable control of the party claiming Force Majeure shall constitute Force Majeure events provided that the party claiming Force Majeure serves a notice in writing to the other party within twenty-five (25) days of occurrence and cessation of each event.

Further, provided that, the SELLER, if claiming Force Majeure, has to establish to the satisfaction of the BUYER and the USER that:
a)   The events have delayed the performance of work, and,
b)   Were beyond reasonable control and not due to the default or negligence of the SELLER.

Time for performance of the contractual obligation under this Contract shall then be extended by a period not more than the duration of such an event.

If the delay caused by such an event continues beyond a period of 90 (Ninety) days, the Parties shall discuss and find a solution to the problem. If no agreement can be reached in the next 30 (Thirty) days the other party shall have the right after the expiry [sic] of the period of 120 (One Hundred Twenty) days from the date of commencement of the alleged event, to terminate the Contract with the written notice to the party claiming Force Majeure.

(*Id.* at Article 10 (emphasis supplied).)

After the contract was signed by the parties, Camber Alabama, the "guarantor" of the contract (*Id.* at preamble), obtained an irrevocable letter of credit from SouthTrust Bank, N.A. ("SouthTrust") in Birmingham, Alabama, in the amount of $522,277.

6

The letter of credit issued by SouthTrust was directed to the State

Bank of India and provided, in pertinent part:

> We hereby establish our Irrevocable Letter of Credit No.
> SB 1813 dated September 18, 1998 in your favor for the
> account of Camber Corporation, 635 Discovery Drive,
> Huntsville, AL 35806 up to the aggregate amount of USD
> 522,277.00 available by your authenticated SWIFT/Telex
> stating:
>
> "We hereby certify that we have been presented a drawing
> under our Performance Guarantee issued on behalf of
> Camber Corporation in connection with Contract No.
> 017/DSR/C/98-99/ASTT(MB) dated June 11, 1998"
>
> This letter of credit will become operative upon Camber
> Corporation's receipt of Advance Payment in the amount of
> US$ 522,227.00 at which time we will advise you by
> amendment.
>
> . . .
> The Letter of Credit is subject to the Uniform Customs
> and Practice for Documentary Credits (1993 Revision)
> International Chamber of Commerce Publication Number 500.
>
> . . .
> Your Guarantee is to expire March 3, 2000.

(Plaintiff's motion for preliminary injunction, exhibit 3 (emphasis

supplied).)   Subsequently, on October 8, 1998, the State Bank of

India issued a deed of guarantee to Macmet in the amount of

$522,277.   (*Id.*)   That guarantee provided in part:

> We State Bank of India hereby expressly, irrevocably and
> unreservedly undertake and guarantee that if in the event
> you declare to us that the Seller has failed to fulfill
> its obligations according to the said contract, then on
> demand in writing by the Buyer, we shall without demur
> repay to you through your case credit account No. 200692
> maintained with United Bank of India ... a sum due by the

7

Seller, under the contract up to a maximum amount of
$522,277.00.

(*Id.*)

Approximately three months <u>before</u> the execution of the
contract between Macmet and Camber, however, the United States
Government had issued trade sanctions against India, thereby
limiting Camber's ability to ship goods to Macmet under the terms
of the contract. *See* Revocation of Munitions Exports Licenses and
Other Approvals for India, 63 Fed. Reg. 27781-01 (1998). Effective
May 13, 1998, "all licenses and other approvals to export or
otherwise transfer defense articles and defense services from the
United States to India ... are revoked immediately." *Id.*
According to the United States Department of State, such sanctions
were imposed because

> the President determined pursuant to Section 102 of the
> Arms Export Control Act (22 U.S.C. 2779aa-1) ("the Glenn
> Amendment") that India[,] a non-nuclear weapons state,
> detonated nuclear explosive devices on May 11, 1998, and
> directed the relevant United States Government agencies
> — and instrumentalities to take the necessary actions to
> impose the sanction described in Section 102(b)(2) of
> that Act.
> . . .
> Consistent with such law and in furtherance of the
> foreign policy interests of the United States, the
> Department of State, through publication of this notice,
> is revoking all licenses and other approvals for the
> permanent and temporary export and temporary import of
> defense articles and defense services to or from India

8

and will deny all applications and other requests for
approval to export or otherwise transfer or retransfer
defense articles and defense services to India.   This
revocation     order     includes     all     types     of
licenses/authorizations;     manufacturing,     technical
assistance and distribution agreements; the use of any
exemption   in   the   International   Traffic   in   Arms
Regulations (ITAR); and, any authorization to retransfer
from a foreign destination.

(*Id.*)

Both parties were aware of the trade sanctions before they
executed the contract.   (Madappa's affidavit ¶¶ 7-10, 41-48, 67-
71.)   Both Macmet and the Indian Navy were "concerned" about
Camber's ability to perform in light of the sanctions.   (*Id.* ¶ 41.)
Macmet,   at   the   urging   of   the   Indian   government,   requested
assurances from Camber, prior to the execution of either contract,
that Camber would be able to perform irrespective of the embargo.
(*Id.* at 43.)   In response, Camber gave both oral and written
affirmations that the trade sanctions would not affect its ability
to perform.   For example, the President and C.E.O. of Camber and
Camber Alabama, Walter Batson, Jr., gave the following written
assurance by letter dated May 19, 1998:

Camber International LLC, a wholly owned subsidiary of
Camber Corporation, is prepared to fully perform on the
ASTT contract with the Indian Navy.   We applied to the
United States Department of State for an export license
to perform on this contract.   We received a reply stating
that no export license was required since the deliverable

9



items did not meet the definition of a defense article
under ITAR Section 120.6.

The newly imposed sanctions from the United States limits
the export of defense articles to India. Based on the
data that we have today, it is our understanding that the
ASTT project is not covered under the sanctions and to
our best knowledge there is no reason why we will be
prohibited from performing on this contract.

Therefore, assuming that we can reach a final negotiated
contract, we believe that we can perform as proposed to
Macmet....

(Madappa's affidavit at exhibit 3.)  "[I]n reliance upon Camber's

assurances that it could perform notwithstanding the contract,

Macmet entered into the ASTT contract with the Indian Navy [on June

11, 1998]."  (Madappa's affidavit ¶ 48.)

Batson provided additional assurances to Macmet by letter

dated August 25, 1998, three days prior to the execution of the

contract between Camber and Macmet, that the trade sanctions would

not hinder Camber's performance:

We at Camber Corporation confirm that we applied to the
State Department of the United States for an export
license for supplying our share of the components, as a
subcontractor to Macmet India Limited on our Action Speed
Tactical Trainer (ASTT) project of the Indian Navy on
April 13, 1998.

The Department of State, responded on May 11, 1998, DTC
Case No. 735153, that under its interpretation of the
International Trade in Arms Regulations and our proposed
contract, that the ASTT components "do not meet the
definition of defense articles ..., and therefore do not
require a State Department license."  This position has

10

been reconfirmed telephonically since the imposition of sanctions.   Hence, unless the Government's position changes, we believe we are cleared to proceed with the contract.

Further, we guarantee the performance of our wholly owned subsidiary, Camber International, L.L.C.   We shall complete all obligations entered into by Camber International with you on the ASTT contract in the even Camber International does not perform on the Contract.

(*Id.* at exhibit 8.)

After the execution of the contract, however, Camber missed several scheduling deadlines: "[b]y June 8, 1999, Camber's performance was off by six (6) weeks and by September 6, 1999[,] it was off by nine (9) weeks." (Madappa's affidavit ¶ 88.)

Fourteen months after the execution of the contract, Camber's program manager, Dave Biggs, notified Macmet by e-mail on October 7, 1999, that Camber needed "to verify that [the] Export License requirement has been waived by U.S. State Dept." (Madappa's affidavit at exhibit 11.)   Even though Camber had previously assured Macmet that their contract was exempt from the trade sanctions, Camber sent a series of e-mails to Macmet stating that it was waiting for shipping approval from the United States Commerce Department.   (*Id.* at exhibits 12-19.)

Ultimately, however, the United States Department of State advised Camber by letter dated November 9, 1999, that, should it

11



proceed with a scheduled shipment of software, it would do so in violation of the sanctions.   (Plaintiff's motion for preliminary injunction, exhibit 3.)

Camber subsequently notified Macmet of the trade sanctions by letter dated November 20, 1999, arguing that the sanctions were an "act of government" as defined in the Force Majeure provision of its contract.   (*Id.*, exhibit 4.)   The letter stated, in pertinent part:

> Pursuant to Sections 10 and 27 of the above referenced Contract, notice is hereby given of the existence of an event of Force Majeure as evidence[d] by the enclosed notice of the United States Department of State dated November 9, 1999.  Camber International, LLC and Camber Corporation are unable to perform certain obligations under the Contract due to the acts of the government of the United States of America.  Such acts are beyond the reasonable control of Camber International, LLC and Camber Corporation and are not due to the default or negligence of Camber International, LLC and Camber Corporation.   In accordance with Section 10 of the Contract, time for performance under the Contract shall be extended for a period not more than the duration of the Force Majeure event due to the actions of the government of the United States of America.

(*Id.*)  By separate letter dated the same day, Camber notified the State Bank of India of its intent to exercise the Force Majeure provisions of the contract.   (*Id.*)

Thereafter, by letter dated December 23, 1999, Macmet gave notice to Camber that it was terminating the contract based on

12

Camber's breach of Articles 8, 13, 17, 14, and 28. (*Id.* at exhibit 5.)

Macmet then attempted to collect the full amount of the irrevocable letter of credit. By letter dated December 23, 1999, Macmet notified the State Bank of India that Camber:

> has failed to fulfill its specific performance obligation according to the captioned contract, therefore, in terms of the Bank Guarantee, we call upon you to immediately pay to us a sum of US$ 522,227 ... through our Cash Credit Account no. 2000692 maintained with the United Bank of India....

(Madappa's affidavit at exhibit 32.) In turn, therefore, the State Bank of India made a demand on SouthTrust to release the funds under their letter of credit on December 27, 1999. (Transcript of courtroom proceedings held on January 14, 1999.) According to Tim Singleton, an employee of SouthTrust's Huntsville, Alabama branch, there were problems with the initial demand and, after SouthTrust notified the State Bank of India of the deficiencies, SouthTrust received a corrected and authenticated demand from the State Bank of India on December 29, 1999. (*Id.*)

Those collection attempts prompted Camber to file, on December 29, 1999, a verified complaint and motion for injunctive relief in the Circuit Court of Madison County, Alabama. Camber's motion for temporary restraining order was granted by the state court at 3:35

p.m. on December 29, 1999. SouthTrust ultimately released the requested funds to the State Bank of India pursuant to the letter of credit on January 5, 2000. (*Id.*)

Macmet removed the state action to this court on January 4, 2000, asserting subject matter jurisdiction pursuant to 28 U.S.C. § 1332. Following removal, Camber filed, first, a motion for contempt (doc. no. 3), and subsequently, a motion for preliminary injunctive relief (doc. no. 4). Macmet thereafter filed its motion to dismiss or, in the alternative, to compel arbitration (doc. no. 9).

## II. DISCUSSION

### A. Contempt

The state court's temporary restraining order enjoined:

Macmet India Limited from directly or indirectly, either through the State Bank of India, or otherwise, from requesting, calling, presenting, demanding or otherwise seeking to enforce any rights under the standby letter of credit, No. SB1813, dated September 18, 1998, issued by SouthTrust Bank to [the] State Bank of India in favor of Macmet India Limited.

(*Camber v. Macmet*, No. CV 99-2479 (Circuit Court of Madison County, Alabama, Dec. 29, 1999).)

That order remained binding on the parties following removal. 28 U.S.C. § 1450 (providing in third paragraph that "[a]ll

14

injunctions, orders, and other proceedings had in [a state court]
action prior to its removal shall remain in full force and effect
until dissolved or modified by the district court").

The temporary restraining order would have expired on January
10, 2000. *See Granny Goose Foods, Inc. v. Brotherhood of Teamsters
7 Auto Truck Drivers Local No. 70 of Alameda County*, 415 U.S. 423,
435-36, 94 S.Ct. 1113, 1122-23, 39 L.Ed.2d 435 (1974) (holding
that, even though the third paragraph of 28 U.S.C. § 1450 evidences
a Congressional intent "to preserve the effectiveness of state
court orders after removal, there is no basis for believing that §
1450 was designed to give injunctions ... greater effect after
removal to federal court than they would have had if the case had
remained in state court") (emphasis in original); *see also* Ala. R.
Civ. P. 6(a), 65(b); *see generally* 14C Wright, Miller & Cooper,
*Federal Practice and Procedure: Jurisdiction 3d* § 3738, at 405-410
(1998).

On January 6th, however, Macmet consented to extension of the
order until such time as this court should rule on Camber's
application for preliminary injunctive relief. (*See* Macmet's
motion to continue hearing (doc. no. 6), ¶ 3.)

15

Camber asserts Macmet violated the restraining order by failing to take any action "to prevent the standby letter of credit from being called and the funds secured by the letter of credit released to the State Bank of India ...." (Plaintiff's motion for contempt ¶ 2.)

When a party disobeys a duly issued order of the court, "the recalcitrant may be cited, according to the circumstances, for criminal contempt or civil contempt or both." *Norman Bridge Drug Company*, 529 F.2d 822, 827 (5th Cir. 1976). The nature of the contempt proceedings is dictated by the purposes to be served. "A civil contempt order is compensatory and coercive." *United States v. Barnette*, 129 F.3d 1179, 1182 n.7 (11th Cir. 1997) (citing *Jove Engineering, Inc. v. I.R.S.*, 92 F.3d 1539, 1545 n.4 (11th Cir. 1996)). Civil contempt sanctions serve "'to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained.'" *Local 28, Sheet Metal Workers' International Association v. EEOC*, 478 U.S. 421, 443, 106 S.Ct. 3019, 3033, 92 L.Ed.2d 344 (1986) (quoting *United States v. Mine Workers*, 330 U.S. 258, 303-04, 67 S.Ct. 677, 701, 91 L.Ed 884 (1947)). On the other hand, criminal contempt proceedings serve

16

"to punish defiance of judicial authority." *Lewis v. Baune*, 534 F.2d 1115, 1119 (5th Cir. 1976).

The distinction between civil and criminal contempt proceedings serves another important function. If a person is held in criminal contempt, "the fact that the order is later set aside as incorrect will not effect the judgment of contempt; the purpose there is vindication of the court's authority." *Id.* (citing *United States v. United Mine Workers*, 330 U.S. 258, 294-295, 67 S.Ct.677, 696-97, 91 L.Ed. 884 (1947)). If, however, a person is held in civil contempt, the invalidity of the order is a defense to liability. *Id.* "A judgment of civil contempt, being remedial in nature, stands or falls with the validity or invalidity of the order, and the opposing party should be compensated only if he was entitled to the order." *Id.*

Here, the court is entertaining civil, not criminal, contempt proceedings. The purpose of any citation of contempt is to reimburse Camber for the losses and expenses incurred due to Macmet's non-compliance.

In filing a motion for civil contempt, the petitioner has to prove a prima facie showing of a violation. *Chairs v. Burgess*, 143 F.3d 1432, 1436 (11th Cir. 1998). Specifically, the petitioner

17

"must [first] establish by clear and convincing evidence that the alleged contemnor violated [a] court's earlier order." *Id.* (citing *United States v. Roberts*, 858 F.2d 698, 700 (11th Cir. 1988)).

Once the petitioner has made this showing, "the burden then shifts to the alleged contemnor 'to produce evidence explaining his noncompliance' at a 'show cause' hearing." *Chairs*, 143 F.3d at 1436 (internal quotation omitted). To avoid a finding of civil contempt, a defendant must "'show either that he did not violate the court order or that he was excused from complying.'" *Id.* (emphasis supplied) (quoting *Mercer v. Mitchell*, 908 F.2d 763, 768 (11th Cir. 1990)). In the event a defendant asserts that it did not violate the court order, "the focus of the court's inquiry ... is not on the subjective beliefs or intent of the alleged contemnors in complying with the order, but whether in fact their conduct complied with the order at issue." *Howard Johnson Company, Inc. v. Khimani*, 892 F.2d 1512, 1516 (11th Cir. 1990) (citing *Jim Walter Resources, Inc. v. International Union, United Mine Workers of America*, 609 F.2d 165, 168 (5th Cir. 1980)[1]). Further, "[c]onduct that evinces substantial, but not complete, compliance

---

[1] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981)(*en banc*), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

18

with the court order may be excused if it was made as part of a

good faith effort at compliance." *Khimani*, 892 F.2d at 1516

(citing *Newman v. Graddick*, 740 F.2d 1513, 1525 (11th Cir. 1984)).

The Eleventh Circuit discussed the options available to a

district court upon a finding of civil contempt in *E.E.O.C. v.*

*Guardian Pools, Inc.*, 828 F.2d 1507 (11th Cir. 1987):

> The purposes of civil contempt sanctions are "to coerce
> the defendant into compliance with the court's order, and
> to compensate the complainant for losses sustained." The
> district court has wide discretion to fashion an
> equitable remedy for contempt that is appropriate to the
> circumstances. As the Supreme Court stated in *McComb v.*
> *Jacksonville Paper Co.*, 336 U.S. 187, 193, 69 S.Ct. 497,
> 500, 93 L.Ed. 599 (1949), the court has the power to
> "grant the relief that is necessary to effect compliance
> with its decree. The measure of the court's power in
> civil contempt proceedings is determined by the
> requirements of full remedial relief. This may entail
> the doing of a variety of acts...." Where the purpose of
> the contempt sanction is compensation, a fine is imposed
> that is generally payable to the complainant. The fine
> is determined by the extent of the actual loss and the
> outcome of the basic controversy. Where the purpose of
> the contempt is to secure compliance, the sanction is
> within the district court's discretion. The district
> court is to consider "the character and magnitude of the
> harm threatened by continued contumacy, and the probable
> effectiveness of any suggested sanction in bringing about
> the result desired.

*Id.* at 1515 (other citations omitted). The above analysis

continues to be controlling law within this Circuit. *See United*

19

*States v. City of Miami*, 1999 WL 1040126, at *4 (11th Cir. Nov. 17, 1999) (quoting from *Guardian Pools* approvingly).

Having reviewed all evidence submitted by the parties, the court concludes that Camber has failed to show by clear and convincing evidence that Macmet violated the terms of the state court's temporary restraining order. Specifically, the court finds that although Macmet did attempt to collect on the bank guarantee issued by the State Bank of India, it only made one such request, on December 23, 1999, and such request was made prior to the entry of the temporary restraining order.

The State Bank of India, in turn, made two demands on SouthTrust pursuant to the irrevocable letter of credit. Both of those demands also were made prior to the entry of the temporary restraining order. At no time after the entry of the temporary restraining order did Macmet make any efforts to enforce the letter of credit. Moreover, SouthTrust never received any direct communication from Macmet.

Nonetheless, Camber argues that Macmet had a duty under the temporary restraining order to withdraw the December 23, 1999 demand to the State Bank of India. The court, however, disagrees. The state court's restraining order enjoined Macmet "for a period

20

of ten (10) days ... from directly or indirectly ... requesting,
calling, presenting, demanding, or otherwise seeking to enforce any
rights under the standby letter of credit." (*Camber v. Macmet*, No.
CV 99-2479 (Circuit Court of Madison County, Alabama, Dec. 29,
1999).) The order did not specifically require Macmet to withdraw
any demands Macmet had previously made; it only prohibited Macmet
from making a demand in the future. In other words, the language
of the order is forward-looking; it proscribes conduct that has not
yet occurred, or from "requesting, calling, presenting, demanding,
or otherwise seeking to enforce" the letter of credit. In sum, the
scope of the order is not broad enough to require Macmet to remedy
any previous action already taken.

But even assuming Camber's argument to be correct, the court
refuses to hold Macmet in contempt because the state court should
not have entered the injunction. To justify the entry of a
temporary restraining order, Camber must satisfy four
prerequisites: (1) demonstrate a substantial likelihood of
ultimately prevailing on the merits; (2) show it will suffer
irreparable harm if an injunction maintaining the status quo
*pendente lite* does not issue; (3) prove that the threatened injury
to Camber outweighs whatever damage the proposed injunction may

21

cause the opposing party; and (4) demonstrate that the injunction will not be adverse to the public interest. *E.g.*, *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998); *Northeastern Florida Chapter of the Association of General Contractors of America v. City of Jacksonville, Florida*, 896 F.2d 1283, 1284 (11th Cir. 1990). *See generally* 11A Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 2948, at 131-33 (2d ed. 1995).

Here, the court finds that Camber failed to demonstrate that it would be irreparably harmed absent the entry of the injunction. Specifically, the court concludes that Camber has an adequate remedy at law: the recovery of damages in its breach of contract claim.

A letter of credit is generally equivalent to a loan made by an issuing bank to an applicant that ensures against the applicant's nonperformance of an obligation. *Southern Energy Homes, Inc. v. AmSOUTH Bank of Alabama*, 709 So. 2d 1180, 1186 (Ala. 1998). "The beneficiary of the standby credit may receive its money first, regardless of pending litigation with the applicant. The applicant may then sue the beneficiary for breach of contract or breach of warranty, or may sue in tort, but without the money." (*Id.*)



Accordingly, "[t]he letter-of-credit transaction is essentially an independent contract between the issuer ... and the beneficiary...." *Id.* at 1185; *see also Foxboro Company v. Arabian American Oil Company*, 805 F.2d 34, 37-38 (1st Cir. 1986); *KMW International v. Chase Manhattan Bank*, 606 F.2d 10, 15 (2nd Cir. 1979). The 1993 revision of the Uniform Customs and Practice for Documentary Credits ("UCP"), which is applicable to the present case under the terms of the letter of credit, likewise describes the transaction:

a.  Credits, by their nature, are separate transactions from the sales or other contract(s) on which they may be based and banks are in no way concerned with or bound by such contract(s), even if any reference whatsoever to such contract(s) is included in the Credit. Consequently, the undertaking of a bank to pay, accept and pay Draft(s) or negotiate and/or to fulfill any other obligation under the Credit, is not subject to claims or defences by the Applicant resulting from his relationships with the Issuing Bank or the Beneficiary.

UCP at Article 3(a).

Only recently, the Alabama Supreme Court affirmed a trial court's decision to dissolve a TRO and deny a motion for a preliminary injunction. *Southern Energy Homes*, 709 So. 2d at 1188. The court adopted the Second Circuit's reasoning in *Foxboro*, 805 F.2d at 37-38, and concluded that the petitioner had an adequate

23

remedy at law, which was to sue "in a German court to recover its money for the alleged fraud." *Id.* at 1187. Although the court recognized that the letter-of-credit transaction placed the movant in a disadvantageous position, the court noted that "[s]hifting litigation costs is one of the functions of a standby credit. ... This cost-shifting function gives one party the benefit of the money in hand pending the outcome of any litigation." *Id.* at 1185.

This court likewise concludes that injunctive relief is improper in the present case. The parties to this transaction bargained for and accepted a letter of credit arrangement. Camber has offered no proof and, indeed, no argument, that under the terms of the letter of credit, not the underlying contract, that Macmet is not entitled to draw upon the irrevocable guarantee.

Moreover, Camber also expresses great concern that it will be unable to reclaim the monies distributed from the letter of credit "[d]ue to judicial and political corruption in India." (Plaintiff's motion for a temporary restraining order ¶ 2.) The court rejects this argument, because it amounts to nothing more than pure speculation. *Compare Itek Corporation v. First National Bank of Boston*, 730 F.2d 19, (1st Cir. 1984) (affirming the granting of a preliminary injunction preventing the honoring of a

24

letter of credit because the contract involved the imperial government of Iran that was interrupted due to the Iranian revolution and the seizing of American hostages).

Accordingly, this court concludes that Camber was never entitled to the entry of a temporary restraining order. "[A]n injunction to impede the honoring of a letter of credit is an extraordinary remedy that should rarely be granted. This is so because their near inviolableness is an important element of trust underlying a large segment of international commerce." *Foxboro*, 805 F.2d at 37. Thus, Camber's motion for contempt is due to be denied.

## B.    Preliminary Injunctive Relief

During the proceedings held in this action on January 14, 2000, counsel for Camber orally moved the court to deny this motion as moot, because SouthTrust had released the funds pursuant to its letter of credit on January 5, 2000. The court granted Camber's motion on the record and, thus, need not explore this issue further.

## C.    Arbitration

Pursuant to an arbitration provision contained in the contract between Macmet and Camber, Macmet argues that the court should

25

either dismiss this action or, alternatively, stay judicial proceedings and order the parties to arbitrate their claims in accordance with the rules of the International Chamber of Commerce. Macmet contends that, because this is an international arbitration agreement, "[t]he policy favoring the enforcement of arbitration clauses is even greater with respect to ... arbitrations held outside of the United States between a U.S. concern and a foreign concern." (Motion to compel arbitration ¶ 6.) Macmet alleges that this agreement is enforceable under Chapter 2 of the Federal Arbitration Act, 9 U.S.C. § 201 *et seq.*, because both the United States and India have adopted or acceded to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards.

The arbitration clause at issue in this case is set forth below in its entirety:

a) In event of dispute arising out of the terms of this Contract, the parties undertake to make every effort to reach an amicable settlement.

b) Notwithstanding anything elsewhere provided in this contract, dispute, disagreement or any question arising of or relating to this contract, or relating to its construction or performance which can not be settled amicably within 60 days or longer period as may be mutually agreed upon from the date of which either party informs the other in writing by a notice that such a dispute, disagreement of question exists be referred to an arbitration tribunal consisting of three arbitrators,

26



which shall convene and proceed in accordance with International Chamber of Commerce Rules for Arbitration.

C) Within 30 days of the receipt of the said notice, one arbitrator shall be nominated in writing by the BUYER and one arbitrator shall be nominated in writing by the SELLER.

d) If the said dispute, disagreement or question as specified above is substantially of a technical nature, each party shall endeavor to nominate as its respective arbitrator, a person who in the opinion of the nominating party has adequate technical expertise.

e) The third arbitrator shall be nominated by mutual consent of the parties within 30 days of the receipt of the notice mentioned above failing which the third arbitrator may be nominated by the President of the International Chamber of Commerce at the request of either party but the said nomination would be in consultation with both the parties. The third arbitrator so nominated shall not be regarded, nor would act as an umpire.

f) The place of arbitration shall be in accordance with Article 14 of the ICC Arbitration Rules.

g) The decision of the majority of the arbitrators shall be final and binding on the parties to this contract.

h) Each party shall bear its own cost of preparing and presenting its case and also the fees and expenses of their respective arbitrators. The cost of arbitration including the fees and expenses of the third arbitrator shall be at the discretion of the Arbitrator.

j) [sic] In event of the vacancy caused in the office of any Arbitrator, the party which nominated such Arbitrator, shall be entitled to nominate another in his place and the arbitration proceedings shall continue from the stage they were left by the retiring Arbitrator.

27



k) In the event of on the parties failing to nominate its
Arbitrator within 30 days as above or if any of the
parties does not nominate another arbitrator within 30
days of the place of arbitrator failing vacant, the other
party shall be entitled after due notice of at least 15
days, to request the President of the International
Chamber of Commerce to nominate another arbitrator, as
above.

I) [sic] If the place of the third Arbitrator falls
vacant, his substitutes shall be nominated according to
the provisions herein above stipulated.

m) The parties shall continue to perform their respective
obligations under this contract during the pendency of
the arbitration proceedings except in so far as such
obligations are the subject of the said arbitration
proceedings.

(Plaintiff's motion for preliminary injunction, exhibit 2 at

Article 14 (emphasis supplied).)

The United States Arbitration Act, more commonly referred to

as the Federal Arbitration Act ("FAA" or "the Act"), was enacted by

Congress in 1925[2] "to ensure judicial enforcement of privately made

agreements to arbitrate" by overruling "the judiciary's

longstanding refusal to enforce" such agreements. *Dean Witter

Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219-20, 105 S.Ct. 1238, 1242,

84 L.Ed.2d 158 (1985).

The need for the law [arose] from an anachronism of our
American law.   Some centuries ago, because of the
jealousy of the English courts for their own
jurisdiction, they refused to enforce specific agreements

[2] United States Arbitration Act of 1925, ch. 213, 43 Stat. 883.



to arbitrate upon the ground that the courts were thereby
ousted from their jurisdiction. This jealousy survived
for so long a period that the principle became firmly
embedded in the English common law and was adopted with
it by the American courts. The courts have felt that the
precedent was too strongly fixed to be overturned without
legislative enactment, although they have frequently
criticized the rule and recognized its illogical nature
and the injustice which results from it. This bill
declares simply that such agreements for arbitration
shall be enforced, and provides a procedure in the
federal courts for their enforcement.

*Id.* at 220 n.6, 105 S.Ct. at 1242 n.6 (*quoting* H.R. Rep. No. 96,
68th Cong., 1st Sess., 1-2 (1924)); *see also* S. Rep. No. 536, 68th
Cong., 1st Sess., 1-2 (1924); *Volt Info. Sciences v. Leland
Stanford Jr. University*, 489 U.S. 468, 474, 109 S.Ct. 1248, 1253,
103 L.Ed.2d 488 (1989).

The original text of the Act was drafted by the American Bar
Association's Committee on Commerce, Trade and Commercial Law. *See*
Matthew W. Finkin, *"Workers' Contracts" Under the United States
Arbitration Act: An Essay in Historical Clarification*, 17 Berkeley
J. Employment & Lab. L. 282, 283 (1996); *see also, e.g., Gilmer v.
Interstate/Johnson Lane Corp.,* 500 U.S. 20, 39, 111 S.Ct. 1647,
1659, 114 L.Ed.2d 26 (1991). The impetus for the legislation came
from those portions of the business and industrial community
engaged in interstate and foreign commerce. Joseph R. Grodin,
*Arbitration of Employment Discrimination Claims: Doctrine and*

29

*Policy in the Wake of* Gilmer, 14 Hofstra Lab. L.J. 1, 7-8 (1996).
The Act was but one part of "a package of three measures, including
a uniform state law and an international treaty, designed to foster
commercial arbitration." Finkin, *supra* at 283-84. The report of
the ABA committee shows the interlocking purposes of the three
proposals, and indicates that each was designed to promote
expeditious resolution of disputes between commercial entities.

> In the opinion of your committee, the adoption of
> the international treaty, the federal statute and the
> uniform state statute will put the United States in the
> forefront of this procedural reform. It will raise the
> standards of commercial ethics. It will reduce
> litigation. It will enable business men to settle their
> disputes expeditiously and economically, and will reduce
> the congestion in the federal and state courts. In
> pressing forward this improvement in the law, the
> Association will align itself with the best economic and
> commercial thought of the country and will do much to
> overcome the criticism of the law's delays.

*Id.* (quoting 45 A.B.A. Rep. 295 (1922)); *see also Scherk v.
Alberto-Culver Company*, 417 U.S. 506, 510-11, 94 S.Ct. 2449, 2453,
41 L.Ed.2d 270 (1974) ("The United States Arbitration Act ... was
designed to allow parties to avoid the costliness and delays of
litigation....") (citations and internal quotation marks omitted).

The Act has been construed as establishing a "liberal federal
policy favoring arbitration agreements." *Moses H. Cone Memorial
Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24, 103 S.Ct.

30

927, 941, 74 L.Ed.2d 765 (1983). It presently is codified at 9 U.S.C. §§ 1-16.[3] Its primary substantive provision is found in section 2, providing that:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. Section 3 provides for a stay of judicial proceedings whenever a court is satisfied that the issue before it is arbitrable under the parties' written agreement, and section 4 directs the court to order parties to proceed to arbitration whenever there has been a "failure, neglect, or refusal" of any party to honor an agreement to arbitrate.

The provisions of the FAA apply with even greater force in cases such as this one, implicating "a truly international agreement." *Scherk*, 417 U.S. at 516, 94 S.Ct. at 2455. In 1970, the United States government acceded to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral

---

[3] The FAA was reenacted and codified in 1947 as Title 9 of the United States Code. *See* Act July 30, 1947, ch. 392, 61 Stat. 669. *See also* Gilmer v. Interstate/Johnson Lane Corp. 500 U.S. 20, 24, 111 S.Ct. 1647, 1651, 114 L.Ed.2d 26 (1991).

31



Awards ("the Convention"), and Chapter 2 of the FAA was passed

later that year.   *See Industrial Risk Insurers v. M.A.N.*

*Gutehoffnungshutte*, 141 F.3d 1434, 1440 (11th Cir. 1998).

> The Convention, and American enforcement of it through
> the FAA, "provide[] businesses with a widely used system
> through which to obtain domestic enforcement of
> international commercial arbitration awards resolving
> contract and other transactional disputes, subject only
> to minimal standards of domestic judicial review for
> basic fairness and consistency with national public
> policy."

*Id.*   Chapter 2 of the FAA "mandates the enforcement" of the

convention in United States courts.   *See* 9 U.S.C. § 201.   It also

creates original subject-matter jurisdiction in the district courts

of the United States "regardless of the amount in controversy."   9

U.S.C. § 203.

Moreover, "Chapter 2 generally establishes a strong

presumption in favor of arbitration of international commercial

disputes."   *Industrial Risk Insurers*, 141 F.3d at 1440.   As the

Supreme Court has observed:

> A parochial refusal by the courts of one country to
> enforce an international arbitration agreement would not
> only frustrate these purposes [of achieving the
> orderliness and predictability essential to any
> international business transaction], but would invite
> unseemly and mutually destructive jockeying by the
> parties to secure tactical litigation advantages.... [It
> would] damage the fabric of international commerce and
> trade, and imperil the willingness and ability of

32

businessmen to enter into international commercial agreements.

*Scherk*, 417 U.S. at 516-17, 94 S.Ct. at 2455-56. The Court has

said on other occasions that

concerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes require that we enforce the parties' [arbitration] agreement, even assuming that a contrary result would be forthcoming in a domestic context.

*Mitsubishi Motors Corporation v. Soler Chrysler-Plymouth, Inc.*, 473

U.S. 614, 629, 105 S.Ct. 3346, 3355, 87 L.Ed.2d 444 (1985).

The expansion of American business and industry will hardly be encouraged if, notwithstanding solemn contracts, we insist on a parochial concept that all disputes must be resolved under our laws and in our courts.... We cannot have trade and commerce in world markets and international waters exclusively on our terms, governed by our laws, and resolved in our courts.

*The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 9, 92 S.Ct. 1907,

1912, 32 L.Ed.2d 513 (1972).

Bearing those principles in mind, this court performs a very

limited inquiry when asked to enforce an agreement that falls

within the Convention's purview. *See Riley v. Kingsley*

*Underwriting Agencies, Ltd.*, 969 F.2d 953, 959 (10th Cir. 1992);

*Leedee v. Ceramiche Ragno*, 684 F.2d 184, 186-87 (1st Cir. 1982).

33



That inquiry is limited to an examination of the following four
questions:

> (1)   Is there an agreement in writing to arbitrate the
>        subject of the dispute?
>
> (2)   Does the agreement provide for arbitration in the
>        territory of the signatory of the Convention?
>
> (3)   Does the agreement arise out of a legal
>        relationship whether contractual or not, which is
>        considered as commercial?
>
> (4)   Is a party to the agreement not an American
>        citizen, or does the commercial relationship have
>        some reasonable relation with one or more foreign
>        states?

*Riley*, 969 F.2d at 959 (quoting *Ledee*, 684 F.2d at 186-187). "If
these questions are answered in the affirmative, a court is
<u>required</u> to order arbitration." *Id.* (emphasis in original).

Here, all four questions are clearly answered in the
affirmative. First, the arbitration agreement is contained within
the parties' contract, thus, satisfying the first requirement in
favor of arbitration.

Second, the agreement expressly identifies that "[t]he place
of arbitration shall be in accordance with Article 14 of the ICC
Arbitration Rules." In turn, Article 14 of the Rules of
Arbitration of the International Chamber of Commerce ("the rules")
provides:

34

⟨⟩

1.    The place of the arbitration shall be fixed by the
      [International Court of Arbitration] unless agreed
      upon by the parties.

2.    The Arbitral Tribunal may, after consultation with
      the parties, conduct hearings and meetings at any
      location it considers appropriate unless otherwise
      agreed by the parties.

3.    The Arbitral Tribunal may deliberate at any
      location it considers appropriate.

Int'l Comm. Arb. R., Article 14.    Although the contract did not

identify a specific arbitration site, the parties did expressly

agree that "[t]he place of the arbitration shall be fixed by the

[International Court of Arbitration] unless agreed upon by the

parties."  *Id.*  Thus, the parties have rendered the choice of venue

"itself a proper issue for resolution by arbitration."  *Matter of*

*Arbitration between United States Lines, Inc. and Liverpool and*

*London Steamship Protection and Indemnity Assoc., Ltd.*, 833 F.

Supp. 350, 353 (S.D. N.Y. 1993); *see also Westbrook International,*

*LLC v. Westbrook Technologies, Inc.*, 17 F. Supp. 2d 681, (E.D. Mich

1998) (ordering the parties to submit the controversy regarding the

proper venue of arbitration to the arbitrator); *Prudential*

*Securities, Inc. v. Thomas,* 793 F. Supp. 764, 767 (W.D. Tenn. 1992)

(finding that the controversy concerning the venue of arbitration

should be settled by the arbitration association).    Accordingly,

35

the agreement provides for arbitration within the territory of the
Convention.

Third, this agreement arises out of a "commercial" legal
relationship. Section 202 of the FAA provides that legal
relationships considered as "commercial" include "a transaction,
contract, or agreement described in section 2 of this Title."
Section 2 provides for the enforceability of a written arbitration
provision in "a contract evidencing a transaction involving
commerce." 9 U.S.C. § 2.

The Supreme Court directs district courts to accord an
expansive construction to the phrase "involving commerce." *See*
*Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 268, 115
S.Ct. 834, 836, 130 L.Ed.2d 753 (1995). Additionally, the Court
has construed the words "involving commerce" as being the
functional equivalent of "affecting commerce": a phrase that
"normally signals Congress' intent to exercise its Commerce Clause
powers to the full." *Id*. at 273, 115 S.Ct. at 839; *see also*
*Paladino v. Avnet Computer Technologies, Inc.*, 134 F.3d 1054, 1060
(11th Cir. 1998) (Cox and Tjoflat, JJ., concurring) (noting that
"[t]he FAA's provisions concerning the validity of arbitration

36

clauses reach to the edge of Congress's power under the Commerce Clause").

Clearly, this contract is one involving commerce.  It is between two companies from different countries, and includes the international exchange of monies, services, and computer software. Thus, the third requirement is satisfied.

Finally, there can be no doubt that Macmet is a citizen of a foreign tribunal.  In plaintiff's complaint, Camber concedes that Macmet is "a company registered under the Companies Act of 1956," with its principal place of business in Calcutta, India. (Complaint ¶ 2.)  Therefore, because Macmet was a party to the arbitration agreement and is not an American citizen, the agreement falls within the scope of 9 U.S.C. § 202.

Having answered all four questions in the affirmative, the court, finds that the agreement is enforceable under Article II of the Convention.  Accordingly, the only remaining issue is whether plaintiff's claims in this lawsuit fall within the scope of the arbitration agreement.

The language of the arbitration clause at issue here is very broad.   The clause provides for arbitration of any "dispute, disagreement or any question arising of or relating to this contract, or relating to its construction or performance."

37

(Plaintiff's motion for preliminary injunction, exhibit 2 at Article 14(b).)

Camber's judicial complaint contains three interrelated claims. Count I is a claim for breach of the contract entered into by Macmet and Camber on August 28, 1998. Camber alleges that Macmet has breached the contract in two ways, first, "by sending notice of termination of the contract on December 23, 1999," and, second, "by attempting to collect on the letter of credit issued by SouthTrust, despite Camber's legitimate and proper claim of force majeure." (Complaint ¶ 33.) Count II is a request for a declaratory judgment, "seeking this court to declare the rights of the parties pursuant to the contract, including the force majeure clause in article 10." (*Id.* ¶ 35.) Count III is a request for injunctive relief, "restraining defendant Macmet ... from exercising on behalf of Macmet, any letters of credit guaranteeing payment to Macmet for a purported breach of performance by Camber." (*Id.* ¶ 39.)

The essence of Camber's claims centers around its belief that the trade sanctions imposed against the Indian government constituted an "act of government" under the Force Majeure clause of the contract. Camber argues that Macmet's rejection of this

38

argument constitutes a breach of contract. Such a determination requires consideration of whether Camber established to the satisfaction of Macmet that such events "[w]ere beyond reasonable control and not due to the default or negligence" of Camber. (Plaintiff's motion for preliminary injunction, exhibit 2 at Article 10.)

Such a dispute, however, clearly falls within the scope of the arbitration clause. It requires an interpretation of contractual provisions, and, accordingly, constitutes a "dispute ... relating to this contract."

Camber's request for injunctive relief is also born out of the same contractual provisions. Although Camber's motion for a preliminary injunction is related solely to its desire to enjoin the payment of SouthTrust's letter of credit, the contract clearly contemplated "th[is] cost-shifting function, giv[ing] [Macmet] the benefit of the money in hand pending the outcome of any litigation." *Southern Energy Homes, Inc. v. AmSOUTH Bank of Alabama*, 709 So. 2d 1180, 1185 (Ala. 1998). Moreover, Camber's claim for injunctive relief has been rendered moot, as SouthTrust has honored Macmet's demand on the letter of credit and transferred the money in accordance with the provisions of that document.

Therefore, having determined that the arbitration clause contained in the contract between Macmet and Camber is enforceable, and that Camber's claims fall within the scope of that clause, the court finds that this action is due to be stayed, and all Camber's claims are due to be referred to binding arbitration in accordance with the terms of that clause.

## III. CONCLUSION

Based on the foregoing, the court finds that Camber's motion for contempt is due to be denied, and Macmet's motion to compel arbitration is due to be granted. An appropriate order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this 14th day of January, 2000

United States District Judge

40